Roubieu<br>v.<br>Palmer.

one per cent. for his brokerage. That *Palmer* has, in breach of the confidence reposed in him, sold at least some of the bills and converted the proceeds to his own use, refusing to render an account of his sales, having paid over only a portion of the proceeds, not offering to return any bills he may not have actually negotiated, and remaining a defaulter for a large balance.

The argument made for the defendant derives its only plausibility from the form in which an account was made out by the plaintiff's bookkeepers, and the circumstance that in many of his payments *Palmer* did not pay over specific sums as the proceeds of discount of specific bills. But upon reference to the testimony of the witnesses the difficulties vanish. It is satisfactorily shown that this account was forced upon *Roubieu's* bookkeeper, from the fact of *Palmer's* not making prompt and specific returns of bills put into his hands without contemporaneous vouchers or formal entries. The mode in which *Palmer* made his payments, and the testimony of the witnesses respecting the account, and the circumstances under which it was kept and rendered to *Palmer*, prove that *Palmer* was not in his later dealings a punctual agent, and that *Roubieu* permitted a loose mode of doing business between his broker and himself; but do not disprove the relation of principal and broker, which, on the contrary, is clearly established by express testimony, and accords also with the publicly known and daily vocation of *Palmer*, as shown by witnesses not in the employment of plaintiff.

As to the money part of the judgment, the only error we find to the defendant's prejudice is in substantially charging him, as under date of 11th July, 1854, with the face of bills of exchange amounting to $16,600, which did not mature until various dates after that day.

In conclusion, it is proper to observe that evidence was introduced without objection with regard to a large amount of bills beyond those enumerated in the petition, and showing the transactions between the parties for a considerable time, and the amount due and unaccounted for by the defendant.

It is therefore decreed that the judgment be amended by reducing the principal sum thereby awarded to the sum of $16,454 89, to bear interest from 11th July, 1854, until paid, and that so amended said judgment be affirmed, the costs of the appeal to be paid by the plaintiff.

---

## BOLTE *v.* THE CITY OF NEW ORLEANS.

The tax assessed by the Common Council on all drinking houses is legal, and the tax on the keeper of such houses is payable at any period of the year when it may be found that he is not provided with a license. But the city has not the right to close the doors of a drinking house *summarily* because of the failure of the keeper of it to take out a license.

APPEAL from the Fifth District Court of New Orleans, *Augustin*, J. *Roselius* and *Collens*, for plaintiff:

An expression of the opinion of your honors upon the following points, raised by the issue between the parties, would not only decide this case, but many others turning upon the same questions, and would avert much litigation.

I. The ordinance violates Article 123 of the Constitution of the State, and the laws of the State incorporating the city, requiring taxation to be "*equal and uniform*."

Article 123 Cons. requires taxation to be "equal and uniform"—this clause

applies to the whole article, and relates to the income tax on professions as well as to property.

Moreover the Act of 1836, p. 127 Bullard and Curry, requires the general Council to fix "*uniform prices for all licenses*" &c. So does also the Act of 1847, p. 140, sec. 1, require taxation to be "equal and uniform." The Acts of 1853, p. 154, extended the laws which applied only to the several Municipalities to the whole city.

Now these laws are violated in two respects: 1st. By imposing different taxes upon different professions; arbitrarily taxing one profession more or less than another, and creating capricious and invidious distinctions between citizens, according to the professions they follow. 2d. By establishing an inequality and a non-uniformity even among the traders in liquor, and dividing them into six classes:

Art. 2.   Those who distill spirituous liquor, $500.
Art. 4.   Those who sell by the glass, $300.
Art. 5.   Those who sell by the quart, $150.
Art. 6.   Keepers of drinking houses who sell beer, $100.
Art. 7.   Those who sell liquor in eating houses, $75.
Art. 8.   Those who sell liquor by the gallon, $60.

To say nothing of the distinctions drawn between grocers who sell spirituous liquors and those who do not sell them, thus looking more to the merchandise a merchant sells than to his profession itself.

It is evident that if this be uniformity—if this be not a violation of the law and Constitution, then the law and Constitution are nugatory; for an *artful* classification of professions would suffice in order to tax one kind of property higher than another, and to reach oppressively those who might be obnoxious to just or unjust prejudices.

II. The ordinance was not legally passed.

When it was sent to the lower Board (as fully appears from the date of the message) it had not been published together with the ayes and noes. See Acts of 1852, page 47, section 19. It should have been published "*before*" being sent to the other Board. It was passed by the Board of Aldermen on the 12th of December, was sent to the lower Board on the same day, and was published on the 14th of December, at which time the Assistant Aldermen were already in possession of it and were acting upon it.

Passed by Board of Aldermen, 12th December, 1854.

Published as passed by Board of Aldermen, 14th December, 1854.

Received by Assistant Aldermen, 14th Dec , 1854.

So that the publication (instead of taking place "*before*" the ordinance, as passed, was sent to the other Board) took place *simultaneously* with the sending.

III. To attempt to enforce the payment of the tax or price of license, even were it legal and constitutional, was premature. It was not due till 1st of March to 1st May. See Acts 1854, page 52, sec. 35; and Acts of 1853, page 86, sec. ——

The "levee dues" are the only taxes exempted from this rule.

The ordinance itself denominates the exaction for the license "a tax," and so does the law. See title and first article of ordinance.

IV. The *mode* of enforcement was illegal and unconstitutional, for no authority was ever vested to coerce payment in this mode, which would make the corporation legislator, judge, suitor and executioner all at once, and which begs the question of a liability to pay the tax, precludes all just defences which might exist, creates a frontier process *in rem* for a tax which is purely *in personam*, deprives a man of his property without due process of law, and virtually abolishes the Judiciary. *Lanfear* v. *Mayor*, 4 La., 97; *Harper* v. *Dorsey*, 4 La., 98; *Rost* v. *Mayor*, 15 La., 129; American Law Register, June, 1854, page 471.

The mode of procedure in such cases is clearly and expressly pointed out in the Act of 1805, page 95 Bullard and Curry's Digest, section 10.

The ordinance itself prescribes the mode in which it shall be enforced. Secs. 25 to 35. Bullard and Curry, page 97 and page 101, sec. 33.

*Livingston*, City Attorney, for defendant and appellant, cited:

*Romazoy* v. *Mayor et al.*, 1 M., 263; *Municipality No. 2* v. *Schmidt*, 1 A., 387; *Charity Hospital* v. *Stickney*, 2 A., 550; *Charity Hospital* v. *Lammerman*, 5 A., 380; *Municipality No. 1* v. *Devrou*, 4 A., 278; *Municipality No. 1* v. *Cutting*, 4 A., 336; *Municipality No. 1* v. *Manuel*, 4 A., 328; *City of Lafayette* v. *Cnm-*

*mings*, 3 A., 673 ; *Buffington* v. *Drinkgrave*, 4 A., 549 ; *Municipality No.* 2 v. *Duncan*, 2 A., 182.

BUCHANAN, J. For the reasons given by the District Judge for the judgment from which this appeal has been taken, it is adjudged and decreed that the said judgment be affirmed with costs.

### REASONS OF JUDGMENT OF THE DISTRICT COURT..

The plaintiff has sued out a writ of injunction against the city corporation, in order to restrain the acts of the City Treasurer, by whom he was notified to pay $315, due for his house for keeping a drinking house, and in default whereof, that the drinking house shall be closed by the police, in virtue of a resolution of the City Council, approved the 16th July, 1852.

The plaintiff alleges that there is no Act of the State Legislature which author- izes such a summary proceeding on the part of the city authorities; and further, that the said tax is illegal and unconstitutional; and if found legal that the tax is not due before the 1st of May next.

The city has joined issue upon these points, and prays that the injunction be dismissed.

The right of the city government to fix a uniform price for the license to drink- ing houses is clearly established by law.

The Act of 1805, section 11, provides that the Mayor shall give licenses for keeping houses under the restrictions to be imposed by the Council, and that all grog-shop keepers, without a license, shall be prosecuted for a fine.

The Act of 1816, page 113, Rev Stat., provides that the city of New Orleans shall have the power to regulate anything which relates to grog-shops, etc.

The Act of March 5th, 1836—the General Council shall have the power to fix uniform prices for licenses to grog-shops, etc.

From the early period of legislation in England the right of control of the police over taverns has been maintained. So the old Norman, cited by Britton, c. 30 : *Soit requis de tous taverniers qui'ont vendu vins à l'encontre du droit d'assize.*

The colonial government of Louisiana, from the primitive police, maintained the same control over grog-shops.

In 1751, at a time when the population of New Orleans numbered in all 975 persons, Governor *Vaudreuil* published an ordinance imposing an annual tax of 300 livres on every grog-shop, for the benefit of the church and of the poor; for- bidding them at the same time to sell liquor on Sundays and holidays during the hours of divine worship. Gayarré's Louisiana, vol. 2, page 42.

The ordinance of Oreilly, of 1770, fixed at $50 the price of these licenses. Walker's Dig., page 7.

The City Council of New Orleans in 1826 fixed the price of these licenses at $150 per annum. In the same ordinance it was provided that every person in- tending to keep a grog-shop shall obtain from the Mayor a license, upon the re- commendation of two respectable freeholders, and besides, he shall furnish a bond, with security, in the sum of one thousand dollars, to secure the payment of all fines for contraventions against the city ordinances. A. Dig City Laws, 1830, page 63.

Besides these *salutary* restrictions on grog-shop keepers, there exists a penal statute of the State. The Act approved 7th April, 1832, sec. 7, page 167, pro- vides that no person shall be allowed to keep a grog or tipling-shop without previously obtaining a license from the Police Jury or city corporation, under penalty of being criminally prosecuted and being fined not more than $500, and in default of paying the fine and costs, of being imprisoned not more than four months.

It becomes then the duty of the District Attorneys throughout the State to cause to be arrested and tried all grog-shop keepers who have not obtained a license as aforesaid.

The Mayor and the Recorders, as ex-officio Justices of the Peace, may cer- tainly exercise the power of arresting all persons found in contravention of the law.

This court therefore considers that the tax of $315, assessed by the Common Council upon all drinking houses, is fully authorized by law. Also that this tax, being uniform upon all similar establishments, is constitutional; that it was passed by the Council in the manner and form prescribed by law, and that it is payable by every grog-shop keeper, at any period of the year, on his being found not provided with the license required by law.

In regard, however, to the right which is claimed by the city authorities to close summarily the doors of drinking houses which are not licensed, this proceeding being a hard one, and derogatory to common right, requires for its justification to be supported by an express provision of law.

The statutes have given to the city against the refractory grog-shop keepers several remedies: first, by fines imposed; second, by suits for the recovery of the tax, and finally, by criminal prosecution.

The city has by law the right of closing the doors of all theatres, ball-rooms, and other places of public exhibition, but nowhere in the statute books is to be found a provision for the application of this measure to grog-shops. For the better efficiency of the police in regard to those establishments, many of which are dens of murderers, rioters, drunken slaves, and clandestine gambling hells, it would probably be desirable that this power be vested in the City Council.

The corporation, a mere creature of the law, cannot exercise a power derogatord to any common right of citizens except by express grant from the sovereign power of the State.

The plaintiff has claimed no damages, and it is evident that, being himself an offender of the law for not taking a license, he could have claimed none.